ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT R. HENSSLER JR. (216165)
ASHLEY M. KELLY (281597)
RACHEL C. BRABY (356720)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bhenssler@rgrdlaw.com
ashleyk@rgrdlaw.com
rbraby@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COY BROOKMAN, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:24-cv-07553-CBM-RAO |
| | CLASS ACTION |
| Plaintiff, | |
| vs. | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| WEBTOON ENTERTAINMENT INC., et al., | DEMAND FOR JURY TRIAL |
| Defendants. | |

4905-1478-6068.v1

1

## TABLE OF CONTENTS

2                                                                                    **Page**

3   INTRODUCTION ......................................................................................... 1

4   SUMMARY OF THE ACTION ..................................................................... 2

5   JURISDICTION AND VENUE ...................................................................... 6

6
    PARTIES ....................................................................................................... 7
7
    SUBSTANTIVE ALLEGATIONS ................................................................ 10
8
9   A.    The Company's Business ...................................................................... 11

10  B.    Defendants' False and Misleading Statements and Omissions Made in
          Connection with the IPO ...................................................................... 13
11
12        1.    Statements Concerning the Company's Monthly Active Users ........ 14

13        2.    Statements Concerning the Company's Revenue Prospects .............. 17

14        3.    Statements Concerning Foreign Currency Fluctations .................... 19

15        4.    WEBTOON's Boilerplate Risk Disclosures were False and
                Misleading .............................................................................. 20
16
17  C.    The Registration Statement Failed to Adequately Disclose Adverse
          Trends and Risks in Violation of SEC Disclosure Regulations ................. 22
18
19  D.    Post-IPO Events ................................................................................... 33

20  CLASS ACTION ALLEGATIONS ................................................................ 36

21  COUNT I
        Violation of §11 of the Securities Act Against All Defendants .................... 38
22
23  COUNT II
        Violation of §15 of the Securities Act Against WEBTOON and the
24      Individual Defendants ............................................................................. 39

25
26  PRAYER FOR RELIEF ................................................................................ 40

27  JURY TRIAL DEMANDED .......................................................................... 40

28

4905-1478-6068.v1

# INTRODUCTION

1.      Lead Plaintiff Dr. Byung-Gon Sung ("Lead Plaintiff") makes the following allegations, individually, and on behalf of all others similarly situated, by and through his counsel upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.   Lead Plaintiff's information and beliefs are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of regulatory filings made by WEBTOON Entertainment Inc. ("WEBTOON" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), analyst and media reports, conference call transcripts, Company press releases, and other publicly available information.   Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a securities class action brought on behalf of all persons who acquired the common stock of WEBTOON traceable to a false and misleading Registration Statement (as amended) and Prospectus (collectively the "Registration Statement") utilized in connection with WEBTOON's June 27, 2024 initial public offering ("IPO") (the "Class").   This case is brought against WEBTOON, its directors, and the investment banks that underwrote WEBTOON's IPO, and concerns defendants' sale of more than $343 million of WEBTOON common stock to Lead Plaintiff and the Class at a price of $21 per share.   This action asserts strict liability claims brought under §§11 and 15 of the Securities Act of 1933 (the "Securities Act").

4905-1478-6068.v1

## SUMMARY OF THE ACTION

3.     Defendant WEBTOON is a global storytelling platform that allows amateur and professional creators to tell long-form stories in the form of short-form, bite-sized episodes released on a weekly schedule.  The Company was founded in Korea in 2005 by defendant Junkoo Kim as a way to share stories and comics with people around the world.  On June 27, 2024, nearly two decades after its founding, the Company had its IPO.

4.     As a newly-traded Company that had yet to achieve profitability, WEBTOON's stock price was heavily dependent upon investors' perceived future growth potential for the Company, including expected user and revenue growth trends.  In order to appeal to investors, the Registration Statement told a compelling story of growth and opportunity in the global web-comic community, with WEBTOON dubbing itself a "high-growth startup," that as of the time of the IPO had "experienced rapid growth in [its] business and revenue."

5.     The IPO came at the tail end of an all-but-completed second quarter ("2Q") of 2024, which had started three months prior.  According to the Registration Statement, at that time, WEBTOON was experiencing "durable and consistent growth" and "stabilization" in its user base of "approximately 170 million" monthly active users ("MAU").  The MAU metric is a critically important measure of WEBTOON's performance, and accordingly, the Company assesses MAU trends on a daily, weekly, and monthly basis.

- 2 -

6.     The Company's Registration Statement discussion of MAU signaled strength in the Company's business and revenue prospects and ability to achieve profitability.  According to the Registration Statement, "[t]he size of our user base [MAU] . . .[is] critical to our success, and ***our financial performance has been, and will continue to be, significantly determined by our success in retaining, attracting and engaging MAU*** and converting them into [paying users]."  The Registration Statement's discussion of "durable and consistent growth" consistent user demand, and the long-term growth trends in MAU signaled the Company's ability to convert additional non-paying users into paying users, resulting in additional revenue.

7.     The Registration Statement also claimed that WEBTOON was experiencing significant revenue growth and set the stage for the Company's historical revenue trends to continue across the Company's three revenue streams. The Registration Statement boasted WEBTOON's "Growth Strategies" that purportedly included "accelerating the growth of [WEBTOON's] advertising business," and "further bolster[ing] the success of [its] IP adaptations business," while highlighting the Company's "substantial market opportunity in growing [the Company's] Paid Content revenue."  The Registration Statement also boasted continual increases in the Company's associated Paid Content Average Revenue Per Paying User ("ARPPU") metric, which according to the Company, is a strong indicator of the Company's strength in Paid Content monetization.

8.     The Registration Statement represented that WEBTOON's IPO was the culmination of nearly two decades of effort spent successfully growing the Company's global community.  And, while there are risks inherent in investing in ***any*** global business, including as to the impact of foreign currency fluctuations, the Registration Statement assured investors that "***the impact of foreign currency exchange rates has not been material to our historical operating results***."

4905-1478-6068.v1

9.    The Registration Statement's representations and disclosures concerning WEBTOON's user base and revenue were materially false and misleading at the time of the IPO.  In truth, rather than experiencing the continued MAU growth depicted in the Registration Statement, MAU had destabilized and was actually in a state of decline year-over-year ("YoY") and quarter-over-quarter.  The Company had lost millions of MAU in the lead-up to the IPO, bringing the key metric to its lowest quarterly level in over a year and halting four quarters' worth of growth in WEBTOON's user base.

10.    Similarly, in contrast to the Registration Statement's representations that WEBTOON was enjoying considerable revenue growth and acceleration in its three diversified revenue streams, revenue growth had actually halted, driven in part by the Company's deceleration and negative growth in both Advertising and IP Adaptation revenue  And rather than having no material impact to the Company's financial results, by the time of the IPO WEBTOON was suffering from substantial foreign currency headwinds resulting in reported revenue substantially lower than expected for the "high-growth startup."

4905-1478-6068.v1

11.     The Registration Statement also failed to disclose known adverse trends in the Company's key metrics that had completely arrested WEBTOON's growth and had a material impact on the Company's operations.  In early August 2024, just a few weeks after the IPO, the Company revealed that it had suffered from "softer overall user dynamics" leading to the deterioration of MAU in 2Q 2024 – a quarter which had begun **three months prior** to the IPO and ended one business day after the IPO.  Contrary to representations in the Registration Statement, at the time of the IPO, the Company was in the midst of a multi-million user downward trend in MAU, which the Registration Statement had described as "stable" and "durable."  The Company also revealed a "***significant exposure to weaker foreign currencies***" throughout 2Q 2024, leading to missed revenue growth expectations and flat total revenue YoY.  The disappointing news presented just six weeks after the IPO stood in stark contrast to the persistent revenue growth portrayed in the Registration Statement.

12.     Investors in the IPO depended upon the Registration Statement to provide true and complete information about the Company.  While defendants had the benefit of WEBTOON's historical and operational data at their disposal at the time of the IPO, the Company's potential shareholders did not.  Because of this informational asymmetry, the federal securities laws obligated defendants to affirmatively provide accurate and fulsome information about WEBTOON, including with respect to, *inter alia*, the Company's MAU, revenue, and foreign currency impacts.  SEC disclosure rules also imposed affirmative obligations on defendants to disclose adverse information and trends that were reasonably expected to have a material impact on the Company's operations.  Defendants' failure to provide full and accurate information about the Company caused WEBTOON's investors to suffer losses.

4905-1478-6068.v1

13.    When the truth of the Registration Statement's misrepresentations and omissions came to light, WEBTOON's stock price declined drastically – collapsing nearly **40%** in a single day following the Company's 2Q 2024 earnings release.

14.    By the commencement of this action, WEBTOON stock price has traded as low as $11.15 per share, reflecting a nearly $10 decline (47%) per share from the $21 per share IPO price:



### JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 22 of the Securities Act.

17.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4905-1478-6068.v1

18.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Lead Plaintiff Dr. Byung-Gon Sung acquired the common stock of WEBTOON pursuant or traceable to the IPO, as set forth in his Private Securities Litigation Reform Act Certification (ECF 32-2), and has been damaged thereby.

20.     Defendant WEBTOON is a Delaware corporation with its principal executive offices located in Los Angeles, California.  WEBTOON's common stock trades on the Nasdaq Global Select Market ("Nasdaq") exchange under the symbol "WBTN."

21.     Defendant Junkoo Kim was, at all relevant times, the Founder, Chief Executive Officer, and Chairman of the Board of Directors of the Company. Defendant Junkoo Kim signed the Registration Statement on behalf of the Company.

22.     Defendant David J. Lee was, at all relevant times, the Chief Financial Officer, Chief Operating Officer, and Director of the Company.  Defendant David J. Lee signed the Company's Registration Statement on behalf of the Company.

23.     Defendant Haejin Lee was a Director of the Company and signed the Company's Registration Statement on behalf of the Company.

24.     Defendant Namsum Kim was a Director of the Company and signed the Company's Registration Statement on behalf of the Company.

25.     Defendant Jun Masuda was a Director of the Company and signed the Company's Registration Statement on behalf of the Company.

26.     Defendant Isabell Winkles was a Director of the Company and signed the Company's Registration Statement on behalf of the Company.

27.     Defendant Nancy Dubuc was a Director of the Company and signed the Company's Registration Statement on behalf of the Company.

4905-1478-6068.v1

28.     The defendants referenced above in ¶¶21-27 are referred to herein as the "Individual Defendants."

29.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the Company's IPO.  In the IPO, Goldman Sachs agreed to purchase 4,575,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

30.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the Company's IPO.  In the IPO, Morgan Stanley agreed to purchase 4,275,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

31.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO.  In the IPO, J.P. Morgan agreed to purchase 2,550,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

32.     Defendant Evercore Group L.L.C. ("Evercore") served as an underwriter for the Company's IPO.  In the IPO, Evercore agreed to purchase 1,125,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

33.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as an underwriter for the Company's IPO.  In the IPO, Deutsche Bank agreed to purchase 750,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

34.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the Company's IPO.  In the IPO, UBS agreed to purchase 750,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

35.     Defendant HSBC Securities (USA) Inc. ("HSBC") served as an underwriter for the Company's IPO.  In the IPO, HSBC agreed to purchase 450,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

- 8 -

36.    Defendant Raymond James & Associates, Inc. ("Raymond James") served as an underwriter for the Company's IPO.  In the IPO, Raymond James agreed to purchase 300,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

37.    Defendant LionTree Advisors LLC ("LionTree") served as an underwriter for the Company's IPO.  In the IPO, LionTree agreed to purchase 225,000 shares of WEBTOON's common stock, exclusive of its over-allotment option.

38.    The defendants referenced above in ¶¶29-37 are referred to herein as the "Underwriter Defendants."

39.    Each of the Underwriter Defendants participated in the drafting of, and were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement.  In their roles as underwriters, the Underwriter Defendants purportedly conducted an adequate and reasonable investigation into the business and operations of WEBTOON, which undertaking is known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  To that end, during the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning WEBTOON's operations and financial metrics.

40.    The Underwriter Defendants also caused the Registration Statement to be filed with the SEC and declared effective in connection with the offer and sale of stock registered thereby.  The Underwriter Defendants urged the SEC to accelerate the effectiveness of the Registration Statement.  The Underwriter Defendants collectively received more than $24 million in connection with their role in underwriting the offering.

- 9 -

41.     Defendant WEBTOON and the Individual Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement.  Each of the Underwriter Defendants are likewise liable as they acted as part of the underwriting syndicate, which drafted and disseminated the offering documents in connection with the IPO.

## SUBSTANTIVE ALLEGATIONS

42.     On May 31, 2024, defendants filed a registration statement on Form S-1 with the SEC in connection with the planned sale of WEBTOON common stock to the public.  The following month, on June 17, 2024, defendants filed an amended registration statement on Form S-1/A.  The SEC declared the Registration Statement effective on June 26, 2024.

43.     On June 27, 2024, defendants filed a prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.  The same day, the Company completed the IPO and trading in WEBTOON common stock commenced.    Defendants sold 16,371,549 shares, or over $343 million of WEBTOON common stock to Lead Plaintiff and members of the Class at $21 per share pursuant to the Registration Statement.

44.     WEBTOON's fiscal year corresponds with the calendar year. Accordingly, at the time of the IPO, defendants had the benefit of operational data for a nearly-complete quarter, as the Company's 2Q 2024, which ended June 30, 2024, started three months prior.

- 10 -

## A. The Company's Business

45. As a newly-traded company that had yet to achieve profitability, WEBTOON's stock price was heavily dependent upon investors' perceived future growth potential for the Company, including expected user and revenue growth trends. In order to appeal to investors, the Registration Statement told a compelling story of growth and opportunity in the global web-comic community, with WEBTOON dubbing itself a "high-growth startup," that as of the time of the IPO had "experienced rapid growth in [its] business and revenue."

46. At the time of the IPO, WEBTOON had purportedly grown to be the leading web-comic provider in each of the Company's major geographies, including Korea (#1), the United States (#1), and Japan (#1), and was ranked first in multiple geographies throughout Southeast Asia and Europe in terms of MAU. WEBTOON's mid-2024 IPO was described to be the culmination of nearly two decades of effort spent successfully building the Company's global community.

47. According to the Registration Statement, the Company's performance is dependent upon several "key metrics" that the Company "*track[s] and review[s] to measure our performance, identify trends,* formulate financial projections, and make strategic decisions," and to "*evaluate growth trends [and] analyze user demand*." Among those "key metrics" WEBTOON "*regularly review[s]*" are MAU, Monthly Paid Users ("MPU"), and Paid Content ARPPU.

48. MAU means users who have visited WEBTOON's offerings at least once in the applicable calendar month, averaged over each month in the given period, and reflects the size of WEBTOON's user base and consumer demand for the Company's offerings. WEBTOON "track[s] MAU as an indicator of the scale of our active user base, user engagement and adoption."

49.    The Company's revenue growth is tied to growth and stability in MAU. According to the Registration Statement, one of the Company's primary "Growth Strategies" was to "[a]cquire new users," and to "grow our user base globally."  The MAU metric is so important to the Company's performance that WEBTOON "look[s] at average users on a daily, weekly and monthly basis to understand broader trends in consumption."

50.    MPU means users who have paid to access WEBTOON's Paid Content, and is an "indicator[] of the strength of [the Company's] monetization."  ARPPU reflects the average Paid Content revenue divided by the MPU.  ARPPU is "an indicator of both the strength of engagement and Paid Content monetization" and the conversion of MAU to MPU equates to growth in the Paid Content ARPPU key metric.

51.    WEBTOON assessed growth through MAU, MPU, and ARPPU. According to the Registration Statement, WEBTOON's monetization strategy "is to bring scaled audiences around the globe to our platform, to deliver them unique and easy-to-consume content, customized for their preferences, to drive more habitual engagement and ultimately, to induce them to pay for content."  The Company's success is thus premised upon attracting an expansive user base (broad MAU), enticing those users to stay on the platform and digest content, and ultimately motivating those users to purchase Paid Content as MPU (*i.e.*, to convert non-paying MAU to MPU).

52.    The Company's monetization strategy is structured as a funnel with three tiers – "Acquisition," "Engagement," and "Conversion."  At the top of the funnel is "Acquisition," which aim is to acquire an expansive user base.  At the bottom of the funnel is "Conversion."  The more inputs into the funnel (*i.e.*, MAU), the more output (MPU and ARPPU).

4905-1478-6068.v1

53.    According to the Company, "[t]he size of our user base and our users' level of engagement are critical to our success, and ***our financial performance has been, and will continue to be, significantly determined by our success in retaining, attracting and engaging MAU*** and converting them into MPU."  The Company "track[s] MAU as an indicator of the scale of our active user base, user engagement and adoption," and as of the date of the IPO, WEBTOON's MAU had "demonstrated durable and consistent growth."

54.    The Company's revenue is derived from three distinct revenue streams: Paid Content, Advertising, and IP Adaptations; with Paid Content providing the vast majority of the Company's revenue.  Still, the Company claimed it was poised for revenue growth, and "see[s] a market opportunity of approximately $130 billion in Paid Content, $680 billion in Advertising and $900 billion in our IP Adaptations businesses."  According to the Registration Statement, "[WEBTOON] ha[s] a substantial market opportunity in growing our Paid Content revenue by attracting more users, driving higher engagement and paying ratio, and increasing our average paid content revenue per paying user (ARPPU)."

55.    The Company's revenue is generated globally in multiple currencies, primarily the Korean Won, Japanese Yen, and U.S. Dollar.  WEBTOON's functional currency for SEC reporting purposes is the U.S. Dollar, however, the Korean Won and Japanese Yen are the functional currencies of WEBTOON's major operating subsidiaries through which WEBTOON operates its web-comic offerings, though the Company did not provide investors with results of the Company's operations in Korean Won nor Japanese Yen.

**B.    Defendants' False and Misleading Statements and Omissions Made in Connection with the IPO**

56.    The Registration Statement contained materially untrue or misleading statements of material facts and/or omitted to state various facts necessary to make the statements made therein not materially misleading or incomplete in violation of

- 13 -

the Securities Act.  In particular, and as set forth below, the statements in these materials were materially inaccurate, misleading, and/or incomplete with respect to: (i) the stability of WEBTOON's MAU key metric, which as of the date of the IPO, was experiencing weakness and was in a state of decline; (ii) the Company's financial performance and revenue prospects, which were decelerating as of the time of the IPO, causing an abrupt decline in the Company's reported ARPPU metric following a period of sustained growth; and (iii) the nature and extent of the Company's exposure to fluctuations in foreign currency, which was having a material adverse impact on the Company's operations and revenue.

### 1.      Statements Concerning the Company's Monthly Active Users

57.    For reporting purposes, WEBTOON reports metrics in three geographies: Korea, Japan, and Rest of World.  The Registration Statement disclosed "***Trends in Monthly Active Users***," which emphasized that the Company's MAU "key metric" "ha[s] ***demonstrated durable and consistent growth*** across regions." The Registration Statement further disclosed that WEBTOON had been experiencing accelerating YoY growth in Global MAU for the four quarters immediately preceding the IPO:

- 14 -



58.    The Registration Statement also repeatedly stressed the stability the Company was experiencing in its MAU.  According to the Registration Statement, at the time of the IPO, WEBTOON's Global MAU had "scaled" and "*stabilized* to reach approximately 170 million" MAU.  The Registration Statement also reported that in Korea, WEBTOON's "largest and most mature market" in terms of MAU penetration, the Company recorded 24.7 million MAU as of the quarter immediately preceding the IPO, representing 4.4% in YoY growth in that geography.  According to the Registration Statement, Korea MAU "*display[ed] a generally stable trend with modest fluctuations*."

59.    The Registration Statement further represented that for Rest of World MAU, "[s]tarting from the third quarter of 2023, we observed *rebound* of our MAU, *driven by organic user growth* and a clear focus on prioritizing our core markets. . . . This sets the stage for significant opportunities to *drive user growth*."

- 15 -

60.     The statements in ¶¶57-59 concerning WEBTOON's "durable and consistent" growth in Global MAU, "stable trend" in Korea MAU, "rebound" and "stabilization" and "user growth" in Rest of World MAU were materially inaccurate, misleading, and/or incomplete because, among other things, they failed to disclose that the scale of the Company's user base was contracting and in a state of decline at the time of the IPO.  In reality, WEBTOON's Global MAU was not at all "durable and consistent," and was deteriorating, resulting in the loss of millions of Global MAU in the lead up to the IPO as the Company suffered from soft user dynamics in Korea and Rest of World despite proclamations of continued growth and "stabilization" in the key metric in those regions.  Rest of World MAU had not "rebounded," nor "stabilized," (*see* ¶¶87-88) and Korea MAU was not "stable," nor "durable," but instead at the time of the IPO both regions had dropped to their lowest quarterly MAU levels in a year or more, with Korea MAU growth declining 6.6% YoY due to soft user dynamics before the IPO.  As more fully described below (¶¶85-89), the Registration Statement's disclosures concerning MAU were also misleading and violated SEC disclosure rules as they were not indicative of WEBTOON's future performance because at the time of the IPO, the Company was already experiencing a downward trend in the key metric:



### 2. Statements Concerning the Company's Revenue Prospects

61. The Registration Statement highlighted WEBTOON's 2023 total revenue growth of 19% YoY. According to the Registration Statement, that revenue "growth was driven by our Paid Content Business, advertising in Japan, and successful IP Adaptations in Korea." The YoY growth came as the Company's "strategic adjustments to *focus on core businesses and prioritize [its] core markets had stabilized, and operations returned to normal*," following "modest" declines in total revenue in 3Q 2023.

62. The Registration Statement also highlighted WEBTOON's "substantial" opportunity for "*growing our Paid Content revenue by attracting more users*, driving higher engagement and paying ratio, *and increasing our average paid content per paying user (ARPPU)*," emphasizing that WEBTOON's "*total monthly Paid Content ARPPU has increased over time* as our users explored more titles and purchased more episodes behind our paywall."

63. According to the Registration Statement, "the average user spent $11.5 on Paid Content [ARPPU] per month in the quarter ended March 31, 2024," making that quarter more successful in the key ARPPU metric than any other quarter the preceding two years. The trend disclosed in the Registration Statement (based on financial results through March 31, 2024) shows that WEBTOON had experienced a period of sustained YoY growth in ARPPU for the five quarters preceding the IPO, peaking at $11.50 the quarter immediately before the IPO:



| Global | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | $7.8 | $9.5 | $9.2 | $8.6 | $11.0 | $11.0 | $10.9 | $11.1 | $11.5 |
| | Q1'22 | Q2'22 | Q3'22 | Q4'22 | Q1'23 | Q2'23 | Q3'23 | Q4'23 | Q1'24 |
| YoY Growth | - | - | - | - | 41.3% | 15.7% | 18.0% | 29.7% | 4.7% |

64.     The Registration Statement also touted that WEBTOON's "high-intent, sought-after user base attracts advertisers," and claimed the Company's purported "***Growth Strategies***," included "***[a]ccelerat[ing] the growth of our advertising business*** by enhancing our advertising products and reaching new advertisers." According to the Registration Statement, the Company "believe[d] that [it] ha[d] the opportunity to increase advertising revenue as we continue to innovate our advertising products and capture and increasing portion of the $680 billion digital advertising market globally," and that "***growth in advertising revenue*** will come from both existing advertising partners already on our platform, as well as acquisition of new advertising partners as we expand our advertising products."

65.     WEBTOON claimed that while as of the IPO, the Company "generate[s] a substantial majority of our revenues from Paid Content distribution. . . . [The Company] plan[s] to ***strengthen revenue contribution from our other monetization methods***," including IP Adaptations.  To that end, the Registration Statement likewise boasted "a significant additional market opportunity" in the Company's IP Adaptations business, and claimed that as WEBTOON's "library continues to grow, and we continue to invest in the capabilities to produce IP Adaptations . . . ***we can capture an increasing portion*** of the over $900 billion global entertainment industry."  As defendants acknowledged, "though [WEBTOON is] in the early stage of our adaptation business and have a limited experience in generating substantial revenues from such adaptations, ***we believe we can further diversify our monetization strategy through IP Adaptations***."

4905-1478-6068.v1

66.     The statements in ¶¶61-65 concerning WEBTOON's revenue prospects and growth opportunities, including its "accelerating" growth in Advertising revenue and ability to "strengthen" revenue contributions from Advertising and IP Adaptations, along with persistent "increases" in ARPPU were simply untrue at the time of the IPO on June 27, 2024 and were materially inaccurate, misleading, and/or incomplete because, among other things, they failed to disclose that the Company: (i) was suffering a decline in user base (MAU) as of the time of the IPO, which negatively impacted the Company's ability to generate revenue; (ii) faced significant revenue headwinds caused by depreciation in the strength of foreign currency, contributing to the significant deceleration in the Company's revenue growth; and (iii) was also experiencing declines in its Advertising and IP Adaptations revenue streams as of the time of the IPO, negatively impacting the Company's operations. As investors were likewise unaware, declines in MAU coupled with double-digit declines in revenue in the Company's largest markets, were also contributing to a substantial decline in Paid Content ARPPU.

### 3.     Statements Concerning Foreign Currency Fluctuations

67.     The Company's Registration Statement Management Discussion & Analysis ("MD&A") included reference to WEBTOON's exposure to foreign currency fluctuations:

> Our revenue is generated globally in multiple currencies, primarily the Korean won, Japanese yen and U.S. dollar. Our results of current and future operations and cash flows are therefore subject to fluctuations due to changes in foreign currency exchange rates. As ***the impact of foreign currency exchange rates has not been material to our historical operating results***, we have not entered into derivative or hedging transactions, but we may do so in the future if our exposure to foreign currency becomes more significant.

- 19 -

4905-1478-6068.v1

68.    The Registration Statement's MD&A claims that "***the impact of foreign currency exchange rates has not been material to our historical operating results***," was materially inaccurate, misleading, and/or incomplete because, among other things, the Company was currently exposed to "significant exposure to weaker foreign currencies" throughout 2Q 2024 and revenue headwinds caused by the deterioration of the strength of the Korean Won and Japanese Yen were having an undisclosed, but substantial impact on the Company's operations, causing flat YoY 2Q 2024 revenue of $321 million.  As discussed below (¶¶93-98), the Company's MD&A disclosures concerning currency exchange risk also failed to accurately reflect the persistent business conditions of WEBTOON's business environment, in violation of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303").

### 4.    WEBTOON's Boilerplate Risk Disclosures were False and Misleading

69.    The Registration Statement also purported to warn of risks that, "if" they occurred, "could" have a material effect on the Company, yet failed to disclose that these very "risks" had already materialized as of the time of the IPO, including risks related to decreased user demand and exposure to foreign currencies.

70.    The Registration Statement included a discussion of generic "***Risks Related to Our Business, Industry and Operations***":

> Our growth may decline in the future as a result of a variety of factors, ***including slowing demand for our platform, insufficient growth in the number of creators and users that use our platform***, increased competition, insufficient growth of our overall market, our inability to continue to capitalize on growth opportunities, increasing regulatory costs and the maturation of our business.  We believe that the growth of our business depends on a number of factors, including our ability to:
>
> •    continue to attract and empower creators to create engaging content;
>
> •    attract users and strengthen our brands;
>
> •    increase engagement with users and strengthen our community;

4905-1478-6068.v1

- increase our paying ratio and strengthen our monetization capability;

- continue to innovate and expand our advertising business;

- increase revenues from our IP Adaptations with increasing bargaining power vis-a-vis third-party intellectual property adaptation partners (*e.g.*, studios, publishers, financiers, distributors, producers and potential buyers);

- expand our presence into new geographic markets;

- continue to innovate our platform; and

- maintain sales and marketing efficiency.

We may not successfully accomplish any of these objectives, or such changes may not be favorable to us, and, as a result, it is difficult for us to forecast our future results of operations.  If the assumptions that we use to plan our business are incorrect or change in reaction to changes in our market, **or if we are unable to maintain revenue growth**, our stock price could decline, it may be difficult to achieve and maintain profitability and our business, financial condition and results of operations could be adversely affected.

71.     The risk disclosures also stated "[a]ny future declines in the size of our user base **may** adversely impact our financial performance."

72.     The risk disclosures above, which couched potential risks as mere possibilities, provided investors with no meaningful information as to the ***then-existing*** nature and extent of the multi-million user deterioration in WEBTOON's user base and contracting MAU, the deceleration in the Company's IP Adaptation and Advertising revenue streams and significant declines in Paid Content revenue in Korea and Japan, which contributed to the stalling of Company's total revenue growth and abrupt decline in ARPPU at the end of 2Q 2024.

73.     The Registration Statement's "risk disclosures" also referenced the Company's potential exposure to international currency fluctuations, but that risk was already, as of the time of the IPO, adversely impacting WEBTOON's revenue.

- 21 -

74.    The risk disclosure stated in relevant part:

**Our results of operations, which are reported in U.S. dollars, could be adversely affected if currency exchange rates fluctuate substantially in the future.**

As we continue to expand our international operations, we become more exposed to the effects of fluctuations in currency exchange rates. We incur expenses for employee compensation and other operating expenses at our non-U.S. locations in local currency. Fluctuations in the exchange rates between the U.S. dollar and other currencies could result in the dollar equivalent of our expenses being higher, which may not be offset by additional revenue earned in the local currency. This **could** have a negative impact on our reported results of operations.

75.    That the Company's results of operations "could be" adversely affected by substantial fluctuations in currency exchange rates "in the future," and that foreign exchange fluctuations "**could have a negative impact on our reported results of operations**" was false and misleading because it ignored the economic reality of the Company's then-existing operations –that, as of the time of the IPO, both the Korean Won and the Japanese Yen were experiencing persistent declines in value against the U.S. Dollar. The currency fluctuation risk disclosure failed to alert investors to the negative impact foreign currency fluctuations were already having on the Company's then-existing operations.

**C.    The Registration Statement Failed to Adequately Disclose Adverse Trends and Risks in Violation of SEC Disclosure Regulations**

76.    Item 303 and SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105") of Regulation S-K impose independent and affirmative disclosure obligations for companies undergoing the public offering process and defendants' failure to comply with those disclosure obligations also constitute violations of the Securities Act, separate and apart from the false and misleading statements and omissions identified above.

- 22 -

4905-1478-6068.v1

77.    WEBTOON's Registration Statement was required to furnish information called for under Item 303 of Regulation S-K, 17 C.F.R. §229.303, *Management's Discussion and Analysis of Financial Condition and Results of Operations*.  Item 303 provides, in pertinent part, that the MD&A section of any company's offering materials must:

> *Describe any known trends* or uncertainties *that have had or that [the registrant reasonably expects will have] a material* favorable or *unfavorable impact on net sales or revenues* or income from continuing operations.

17 C.F.R. §229.303(b)(2)(ii).

78.    The SEC's interpretive guidance associated with Item 303 states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

79.    Put simply, Item 303 obligates issuers to focus on material events and uncertainties that would cause a company's reported financial information to be not necessarily indicative of future operating results or of future financial condition.

80.    According to SEC Release 33-8350, a company's "discussion and analysis of known trends," is "*one of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results*."  "Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A." Accordingly:

> Disclosure decisions concerning trends, demands, commitments, events and uncertainties generally should involve the:
>
> •    *consideration of financial, operational and other information known to the company*;

- 23 -

- identification, based on this information, of known trends and uncertainties; and

- assessment of whether these trends and uncertainties will have, or are reasonably likely to have, a material impact on the company's liquidity, capital resources or results of operations.

81.     As the SEC's guidance has explained:

[D]isclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

82.     Pursuant to Instruction 3 of Item 303:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

83.     The Registration Statement was materially false and misleading because the MD&A contained therein failed to disclose material events and uncertainties known to defendants but not disclosed to investors regarding declining MAU, decelerating ARPPU, and adverse trends concerning foreign currency fluctuations, which were reasonably likely to have (and already did have at the time of the IPO) a material adverse effect on the Company's operating results and revenue.

84.     The undisclosed negative events, trends, and uncertainties referenced herein each represented known trends or uncertainties that were reasonably expected to have a material unfavorable impact on the Company's business, sales, and/or revenues, and therefore, were required to be (but were not) disclosed in the Registration Statement.

- 24 -

85.    ***Monthly Active Users***.  As depicted in the following chart, contrary to the Registration Statement's disclosures that WEBTOON's MAU had "stabilized," "scaled," and "rebound[ed]," and that the Company's MAU "ha[s] ***demonstrated durable and consistent growth*** across regions," in actuality, the Company's MAU was in a state of decline as of the time of the IPO, and with just one business day remaining in the Company's 2Q 2024, had fallen from the "approximately 170 million" referenced in the Registration Statement:



86.     Despite that the Registration Statement claimed "durable and consistent growth," in actuality, Global MAU growth had made an abrupt about-face as of the time of the IPO, following four quarters of sustained YoY growth.  The negative growth trend that was taking place as of the IPO was not disclosed to investors:



4905-1478-6068.v1

87.    Rest of World MAU, which the Registration Statement reported had "rebound[ed]" and "entered a period of stabilization," in fact saw a quarterly decline to the lowest quarterly MAU level in a full year, yet the adverse trend was not revealed to investors until after the IPO:



4905-1478-6068.v1

88.     In fact, Rest of World's acceleration in YoY MAU growth had halted and shifted downward as of the time of the IPO:



89.     The positive trends in MAU discussed in the Registration Statement were in no way indicative of WEBTOON's future operating results.  To the contrary, the deterioration in the Company's MAU key metric reflected persistent conditions of WEBTOON's operations and these undisclosed downward trends already existed as of the date of the IPO.  Defendants were aware of this declining metric, as the Company "look[s] at average users on a daily, weekly and monthly basis to understand broader trends in consumption."  And at the time of the IPO, WEBTOON was in the midst of a delay in the anticipated pre-IPO launch of an AI recommendation tool in early 2Q 2024.  That pre-IPO launch, which did not happen in early 2Q 2024 as intended, contributed to "softer user dynamics" for the quarter.  Accordingly, statements made in the Registration Statement regarding the Company's MAU, as described herein, failed to comply with Item 303.

90.     ***Average Revenue Per Paid User***.  WEBTOON's Paid Content ARPPU was also experiencing an undisclosed downward trend as of the date of the IPO. After three consistent quarters of ARPPU growth, the key metric peaked in the quarter immediately preceding the IPO at $11.50.  At the time of the IPO it was in a state of decline, reflecting an undisclosed negative trend in the metric:



91.     The positive trend in quarter-over-quarter ARPPU growth in the Registration Statement was likewise not in any way indicative of WEBTOON's future results, as depicted below:



4905-1478-6068.v1

92.    As a result, SEC disclosure rules required defendants to disclose the changing trend in ARPPU in the MD&A section of the Registration Statement.

93.    ***Foreign Currency Fluctuations***.  While the Company's operations are reported in U.S. Dollars, WEBTOON has a global presence.  Unbeknownst to investors, at the time of the IPO, the Company's operations were experiencing an adverse trend in foreign currency fluctuations that had a material impact on the Company's revenues through 2Q 2024.

94.    The Company's MD&A disclosures included reference to "***Foreign Currency Exchange Risk***," which as discussed above (¶¶67-68) was false and misleading.  The foreign currency disclosure also violated Item 303 because, as of the time of the IPO, both the Korean Won and the Japanese Yen were experiencing persistent depreciation in value against the U.S. Dollar that negatively impacted the Company's operations.

95.    At the end of the quarter immediately preceding the IPO (March 31, 2024), the Japanese Yen had already experienced significant deterioration against the U.S. Dollar in the first three months of the year.  That deterioration persisted through the time of the IPO, which was just one business day prior to the close of 2Q 2024:



- 30 -

96.    Likewise, as the below chart shows, the Korean Won was also experiencing weakness against the U.S. Dollar during the quarter preceding the IPO, through the end of 2Q 2024:



Strength of Korean Won (₩) to USD

January 1, 2024:
1,297 ₩ = $1 USD

March 31, 2024:
1,349 ₩ = $1 USD

June 30, 2024:
1,378 ₩ = $1 USD

Undisclosed Trend

97.    As a hypothetical, assuming WEBTOON generated $100 of total revenue in Japanese Yen or Korean Won on January 1, 2024, by the IPO on June 27, 2024, that $100 in total revenue would be worth just approximately $88.15 and $93.59 in revenue based upon the declining value of Japanese Yen and Korean Won, respectively.  The resulting 11.8% and 6.8% decline in revenue is substantial.[1]

---

[1]    According to WEBTOON's response to an SEC comment letter in the months leading up to the IPO, "[t]he Company applies a quantitative benchmark of 1% of revenue as the initial threshold in assessing materiality for its financial statements, taken as a whole."

4905-1478-6068.v1

98.     WEBTOON's MD&A disclosure that "***the impact of foreign currency exchange rates has not been material to our historical operating results***," was not indicative of current or future results.  In truth, at the time of the IPO, the negative trend in and declining strength of the Korean Won and Japanese Yen throughout the first half of 2024 was already having an existing material adverse effect on the Company's operating results, which were later reported in the Company's 2Q 2024 financial results.  As a global company, defendants were aware of the exposure WEBTOON faced amid the then-existing deterioration in foreign currency.  Failure to disclose that known trend violated Item 303.

99.     ***Reported Revenue Trends***.  The Registration Statement disclosed impressive YoY total revenue growth for the five quarters preceding the IPO:

| Revenue by Quarter Disclosed in Registration Statement | Year-Over-Year Growth |
|---|---|
| 1Q 2023 | 33.25% |
| 2Q 2023 | 11.02% |
| 3Q 2023 | 12.00% |
| 4Q 2023 | 21.93% |
| 1Q 2024 | 5.31% |

100.    Given the above trends and uncertainties that were known to defendants, WEBTOON's MD&A should have disclosed the resulting material unfavorable impact those trends were having on reported revenue, which remained flat as was disclosed after the IPO.  Failure to disclose the known unfavorable impact on the Company's revenue violated Item 303.

101.    Separately, Item 105 requires that a company's offering documents contain, in a separate "Risk Factors" section, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and must adequately describe the risks inherent in investing in that company.

102.   As described above (¶¶69-75), the Registration Statement's discussion of risk factors was itself materially misleading and did not adequately describe the risk posted by the then-already occurring (yet undisclosed) risks impacting the Company's operations, including declining user base and exposure to foreign currency fluctuations.  The Registration Statement provided generic statements of potential risks that "could" happen, while failing to disclose that the potential future risks **had already occurred** as of the time of the IPO.

103.   That the Company's growth "may decline" as a result of slowing demand and insufficient user growth did not adequately warn of the fact that as of the date of the IPO, WEBTOON's user growth had not only slowed, but had declined given softer demand.  Nor did the risk disclosures adequately warn of WEBTOON's present inability to "maintain revenue growth," caused not only by the "softer overall user dynamics" lending to reduced MAU and an inability to successfully grow and strengthen the Company's Advertising and IP Adaptation revenue streams, but also by the "significant exposure to weaker foreign currencies" the Company faced.  The inadequate risk disclosures violated Item 105.

### D.    Post-IPO Events

104.   After markets closed on August 8, 2024, WEBTOON filed a Form 8-K with the SEC attaching a press release reflecting the Company's dismal financial results for the second quarter ended June 30, 2024 – the quarter that closed just one business day after the IPO.

105.    The press release reported highly disappointing second quarter results, including bleak revenue growth and substantial declines in Korea and Rest of World MAU and deterioration of the "approximately 170 million" Global MAU, which had suffered a multi-million user decline from what was reported in the Registration Statement just six weeks prior. Global MAU was reported as just 166.3 million – bringing the key metric to its lowest quarterly level in over a year and halting four quarters worth of growth in WEBTOON's user base. Deterioration of MAU also contributed to the reported 3.7% and 3.6% YoY declines in WEBTOON's IP Adaptation and Advertising revenue, respectively. The "high-growth startup" also reported flat (0.1%) YoY revenue growth to end the quarter.

106.    In a 2Q 2024 Shareholder Letter appended to the Form 8-K, the Company revealed a 5.7% decline in ARPPU in Japan and a nearly 10% decline in ARPPU in Korea as revenue in that region suffered a steep 19.3% decline primarily driven by decreases in Paid Content and Advertising revenue. As a result, the Company reported a 30 cent decline in ARPPU for the quarter, dropping the metric down to $11.20 – the lowest it had been in five quarters – in stark contrast to the continued increases described in the Registration Statement.

107.    On the earnings conference call later that same day, defendant David J. Lee revealed that the Company's "reported revenue was roughly flat year over year," echoing the earnings release statement that the stalled growth was due to "***significant exposure to weaker foreign currencies, including the Korean won and the Japanese yen***," since "85% of [WEBTOON's] revenue is generated outside the US."

4905-1478-6068.v1

108.    Defendant David J. Lee also revealed that Global MAU suffered as the Company experienced "softer overall user dynamics in the quarter as [Korea] MAU of 23.2 million decreased 6.6% year-over-year."  The decreased "user engagement" and 6.6% decline in Korea MAU, coupled with stagnant growth in Rest of World MAU contributed to the worrisome decline in Global MAU.  According to defendant Junkoo Kim, the Company's ARPPU also experienced a decline, "driven by the[] delays" in the pre-IPO launch of an AI-powered recommendation tool, which delays were ongoing as of the time of the IPO, and which extended into the second half of the year.

109.    The following day, August 9, 2024, the price of WEBTOON common stock fell to $12.75, representing a single-day decline of $7.88 (38.2%).

110.    Following the earnings release, analysts remarked "WBTN's 2Q results . . . . did not have strong upside" and attributed the stock price decline to a "***weaker than expected* 2Q *revenue of $321mn (flat YoY), -6% below consensus $341mn*.**" The miss was attributed to "***strong US $ against KRW and JPY***," and "***weak revenue growth on FX*.**"

111.    According to analysts, "***MAU was weaker than expected*,**" and the market "reacted negatively to the ***weak MAU trend*** which was down -0.8% YoY with Korea -6.6% YoY."  Analysts at Deutsche Bank likewise attributed the decline in WEBTOON's stock price to "FX headwinds and underperformance in Korea," and lower-than-expected MAU.

112.    The Company's share price continued to fall following the August 12, 2024 filing of the Company's Form 10-Q with the SEC.  On August 16, 2024, analysts at Morgan Stanley noted that "WBTN shares have declined 40% since its first results as a public company," and remarked that "***[w]e have heard consistent investor concerns following weaker than expected 2Q results*.**"

4905-1478-6068.v1

113.    According to that report, "*investor conversations have consistently focused on 3 points of pushback/concern, which we believe were the main drivers of the negative shift in sentiment*," including "Monthly Active Users Missed Expectations in 2Q," and that "*nearly all of our recent investor conversations touched on WBTN's 2Q GAAP revenue of $321mn (6% below our prior estimate and consensus)*."   According to Morgan Stanley "WBTN's monthly active users (MAUs) declined both q/q and y/y in 2Q vs. *expectations of growth for both metrics*."

114.    Morgan Stanley reported "the fact that MAUs were the source of the [Company's] weakness raises longer term concerns," and that "[t]he company will now likely face greater scrutiny from investors."

115.    Since the IPO, WEBTOON's common stock has continued to languish. As of the date of this suit, WEBTOON common stock traded for $12.27 per share, representing an $8.73 decline – 41.6% – from the $21 IPO price.

## CLASS ACTION ALLEGATIONS

116.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased WEBTOON common stock issued in connection with the Company's IPO.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

117.    The members of the Class are so numerous that joinder of all members is impracticable.  WEBTOON's common shares are actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of WEBTOON common stock were traded publicly on the Nasdaq.  Record owners and other members of the Class may be identified from records maintained by WEBTOON or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

119.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.

120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Securities Act was violated by defendants' acts as alleged herein;

(b)    whether the Registration Statement and statements made by defendants to the investing public in connection with the Company's IPO omitted and/or misrepresented material facts about the business, operations, and prospects of WEBTOON; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

4905-1478-6068.v1

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of §11 of the Securities Act
### Against All Defendants

122.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

123.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against WEBTOON, the Individual Defendants and the Underwriter Defendants.

124.    This Count does not sound in fraud.  Lead Plaintiff does not allege that the Individual Defendants nor the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

125.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

126.    WEBTOON is the registrant for the IPO.  As issuer of the common stock, WEBTOON is strictly liable to Lead Plaintiff and the Class for the misstatements in and omissions from the Registration Statement.

127.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

128.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the

4905-1478-6068.v1

Registration Statement were true and without omissions of any material facts and were not misleading.

129.   By reasons of the conduct herein alleged, each defendant violated §11 of the Securities Act.

130.   Lead Plaintiff purchased WEBTOON shares pursuant and/or traceable to the Registration Statement.  Lead Plaintiff and the Class have sustained damages. The value of WEBTOON common stock has declined substantially subsequent to the IPO as a result of defendants' violations.

131.   At the time of their purchases of WEBTOON common stock pursuant to the Registration Statement, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Lead Plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff filed this complaint.

## COUNT II

### Violation of §15 of the Securities Act
### Against WEBTOON and the Individual Defendants

132.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

133.   This Count is asserted against WEBTOON and the Individual Defendants and is based upon §15 of the Securities Act.

134.   The Individual Defendants were each control persons of WEBTOON by virtue of their positions as directors, senior officers, and/or authorized representatives of the Company.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors

4905-1478-6068.v1

1  and/or officers and/or major shareholders of WEBTOON.  The Company controlled
2  the Individual Defendants and all of its employees.

3    135.  Defendants had a financial interest in taking the Company's stock
4  public, as alleged herein.  And they were each critical to effecting the IPO, based on
5  their signing or authorization of the signing of the Registration Statement, by voting
6  (including voting their shares) to execute the IPO, and by having otherwise directed
7  through their authority the processes leading to execution of the IPO as executives
8  and/or directors of WEBTOON.

9                                    **PRAYER FOR RELIEF**

10    WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

11    A.    Determining that this action is a proper class action, certifying Lead
12  Plaintiff as class representative and Lead Plaintiff's counsel as class counsel under
13  Rule 23 of the Federal Rules of Civil Procedure;

14    B.    Awarding compensatory damages in favor of Lead Plaintiff and the
15  other Class members against all defendants, jointly and severally, for all damages
16  sustained as a result of defendants' wrongdoing, in an amount to be proven at trial,
17  including interest thereon;

18    C.    Awarding Lead Plaintiff and the Class their reasonable costs and
19  expenses incurred in this action, including counsel fees and expert fees; and

20    D.    Such equitable/injunctive or other relief as deemed appropriate by the
21  Court.

22                                   **JURY TRIAL DEMANDED**

23    136.  Lead Plaintiff hereby demands a trial by jury.

24  DATED:  February 3, 2025              ROBBINS GELLER RUDMAN
                                            & DOWD LLP
25                                        ROBERT R. HENSSLER JR.
                                          ASHLEY M. KELLY
26                                        RACHEL C. BRABY

27                                              s/ Ashley M. Kelly
28                                          _____
                                            ASHLEY M. KELLY

                                        - 40 -

1

2
655 West Broadway, Suite 1900
San Diego, CA  92101
3
Telephone:  619/231-1058
619/231-7423 (fax)
4
bhenssler@rgrdlaw.com
ashleyk@rgrdlaw.com
5
rbrabv@rgrdlaw.com

6
Lead Counsel for Lead Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 41 -