ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT R. HENSSLER JR. (216165)
ASHLEY M. KELLY (281597)
RACHEL C. BRABY (356720)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bhenssler@rgrdlaw.com
ashleyk@rgrdlaw.com
rbraby@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COY BROOKMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> WEBTOON ENTERTAINMENT INC., et al., <br><br> Defendants. | Case No. 2:24-cv-07553-CBM-RAO <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED COMPLAINT WITH PREJUDICE <br><br> Judge:    Hon. Consuelo B. Marshall <br> Hearing:  April 22, 2025 <br> Time:    10:00 a.m. <br> Courtroom:  8D |

4900-4398-3397.v1

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

I.     FACTUAL BACKGROUND ...................................................................... 3

       A.     The Company's User Base............................................................. 4

       B.     Revenue Prospects ........................................................................ 4

       C.     Post-IPO Disclosures .................................................................... 5

ARGUMENT......................................................................................................... 7

II.    THE COMPLAINT PLAUSIBLY ALLEGES A §11 CLAIM ..................... 7

       A.     Applicable Legal Standards .......................................................... 7

       B.     The Registration Statement Was Materially Misleading...................... 8

              1.     Material Misstatements About WEBTOON's User Base .......... 9

              2.     Material Misstatements About WEBTOON's Revenue .......... 13

              3.     The Risk Disclosures Are Also Misleading ............................ 14

       C.     Defendants' Other Materiality Arguments Are Unavailing ............... 17

              1.     The Misstatements Are Not Inactionable Puffery................... 17

              2.     The Bespeaks Caution Doctrine Does Not Apply.................... 20

       D.     Items 303 and 105 Provide Independent Bases for Liability.............. 21

              1.     Violation of Item 303 Creates §11 Liability ........................... 21

              2.     Violation of Item 105 Creates §11 Liability ........................... 24

III.   THE COMPLAINT ALLEGES A VIOLATION OF §15 ........................... 24

IV.    CONCLUSION ........................................................................................ 25

4900-4398-3397.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................. 8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................. 14

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023) ...................................................... 21

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ........................................................................... 25

*Franchi v. SmileDirectClub, Inc.*,
633 F. Supp. 3d 1046 (M.D. Tenn. 2022) .......................................................... 23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .............................................................................. 18

*Golubowski v. Robinhood Mkts., Inc.*,
2024 WL 269507 (N.D. Cal. Jan. 24, 2024) ............................................... 12, 23

*Green Dot Corp.*,
2024 WL 1356253 (C.D. Cal. Mar. 29, 2024) ..................................................... 9

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ......................................................................................... 7, 8

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ................................................... 12

*Hoang v. ContextLogic, Inc.*,
2023 WL 8879263 (N.D. Cal. Dec. 22, 2023) .............................................. 12, 15

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................ 14

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) ................................................... 8, 9

4900-4398-3397.v1

**Page**

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................... 13, 23

*In re Facebook, Inc. Sec. Litig.*,
   2023 WL 8365362 (9th Cir. Dec. 4, 2023) ............................................................ 14

*In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*,
   2025 WL 714171 (C.D. Cal. Mar. 3, 2025) ........................................................... 15

*In re Honest Co. Sec. Litig.*,
   615 F. Supp. 3d 1149 (C.D. Cal. 2022) ........................................... 17, 19, 20, 21

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................................... 9

*In re On24, Inc. Sec. Litig.*,
   2023 WL 7449838 (C.D. Cal. July 7, 2023) ......................................................... 20

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................... 18

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................................... 8, 9

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ............................................................................ 8

*Lilien v. Olaplex Holdings, Inc.*,
   2025 WL 444254 (C.D. Cal. Feb. 7, 2025) ................................................... *passim*

*Local 272 Labor-Mgmt Pens. Fund v. The Walt Disney Co.*,
   2:23-CV-03661, 2025 WL 569230 (C.D. Cal. Feb. 19, 2025) ........................... 18

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ............................................................................................... 21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................. 11

- iii -

4900-4398-3397.v1

**Page**

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020)................................................................. 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*
    *Pension Fund*,
    575 U.S. 175 (2015) ..................................................................... 7, 10, 16, 19

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011)............................................................................. 8

*Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022)..........................................................................20

*Rodriquez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................. 19

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016).................................................................... 10, 11

*Shenwick v.Twitter, Inc.*,
    282 F. Supp. 3d 1137 (N.D. Cal. 2017) .......................................... 10, 13, 16, 18

*Sodha v. Golubowski*,
    No. 24-1036 (9th Cir. 2024).............................................................................12

*Stadnick v. Vivent Solar, Inc.*,
    861 F.3d 31 (2nd Cir. 2017) .............................................................................12

*Steckman v. Hart Brewing, Inc.*
    143 F.3d 1293 (9th Cir. 1998)....................................................................21, 22

*Sundaram v. Freshworks Inc.*,
    2023 WL 6390622 (N.D. Cal. Sept. 28, 2023)....................................8, 21, 22, 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ......................................................................................... 7

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ........................................................................................12

- iv -

4900-4398-3397.v1

**Page**

*U.S. v. Smith*,
 155 F.3d 1051 (9th Cir. 1998) ..................................................................... 11, 20

*Weston Family P'ship LLLP v. Twitter, Inc.*,
 29 F.4th 611 (9th Cir. 2022) ............................................................................ 11

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
 §77k .............................................................................................................. *passim*
 §77k(a) ............................................................................................................ 8, 16
 §77(a)(2) .............................................................................................................. 21
 §77o ................................................................................................................ 1, 24

Federal Rules of Civil Procedure
 Rule 8 ..................................................................................................................... 9
 Rule 8(a) ................................................................................................................ 7
 Rule 8(a)(2) ........................................................................................................... 8
 Rule 9(b) ................................................................................................................ 8
 Rule 12(b)(6) ................................................................................................ 3, 7, 9

17 C.F.R.
 §229.105 .......................................................................................................... 3, 24
 §229.105(a) ........................................................................................................... 24
 §229.303 ....................................................................................................... *passim*
 §229.303(a)(2)(ii) ............................................................................................... 21

4900-4398-3397.v1

**PRELIMINARY STATEMENT**

This strict liability securities class action brought pursuant to §§11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k and 77o, concerns false and misleading statements in WEBTOON, Inc.'s ("WEBTOON" or the "Company") Registration Statement and Prospectus (collectively, the "Registration Statement") filed in connection with WEBTOON's June 27, 2024 Initial Public Offering ("IPO"). Defendants are WEBTOON, its board of directors, and the investment banks which underwrote the IPO. ¶¶21-27, 29-37.[1]

The Registration Statement Defendants used to conduct the IPO and sell more than $343 million of WEBTOON common stock emphasized the Company's rapid growth and strategy to attract an expansive user base. But as investors later discovered, the Registration Statement was false and misleading in that it misrepresented and/or omitted material facts, including that, as of the time of the IPO:

- WEBTOON's critically important Monthly Active User ("MAU") metric, a key driver of the Company's revenue and success, had experienced a multi-million user decline and year-over-year ("YoY") deceleration after four quarters of sustained growth;

- WEBTOON was suffering from substantial foreign currency impacts, and that the Company's Advertising and IP Adaptation revenue streams were decelerating, not growing, negatively impacting WEBTOON's second quarter ("2Q") 2024 reported revenue and causing it to be substantially lower than expected for the so-called "high-growth startup;" and

- Potential risks "warned" of, which were couched as mere possibilities, failed to provide investors meaningful information as

---

[1] All "¶" and "¶¶" references are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 60) ("Complaint"). "Plaintiff" refers to Lead Plaintiff Dr. Byung-Gon Sung.

- 1 -

4900-4398-3397.v1

to the then-existing adverse conditions that were negatively impacting the Company's operations.

When the adverse facts and undisclosed negative trends were disclosed on August 8, 2024, WEBTOON's stock price declined drastically – collapsing nearly 40% in a single day.  ¶13.

Defendants' Motion to Dismiss Consolidated Complaint with Prejudice (ECF 61) ("MTD") is wholly improper.[2]  Defendants impermissibly and prematurely advance their own self-serving counter-narrative, including by: (1) focusing almost exclusively on the absolute value of the Company's key metrics disclosed in the Registration Statement and in 2Q 2024, while failing to consider what those values represented to investors in terms of YoY or quarter-over-quarter growth trends; (2) offering post-IPO developments that are not relevant to whether the Registration Statement was misleading as of the time it **became effective**; and (3) referencing cherry-picked financial metrics that are wholly irrelevant to the Complaint's allegations that disclosures concerning MAU, revenue, and foreign currency fluctuations were misleading.  Defendants' factual challenges have no bearing on the legal sufficiency of Plaintiff's allegations.

Each of the arguments asserted in the MTD can be easily disposed of.  *First*, Defendants fail to recognize that §11 imposes liability not only for false statements but also for statements that are misleading by omission.  Defendants cannot selectively tout key metrics while withholding information that would have meaningfully contextualized the Registration Statement's claims.

*Second*, Defendants claim that the Registration Statement's risk disclosures sufficiently warned of the "routine risks inherent to WEBTOON's business" (MTD at 20).  As is clear in the Complaint, the at-issue risk disclosures themselves were

---

[2]  The Underwriter Defendants joined in the MTD and did not assert any separate substantive grounds for dismissal.  ECF 64.

- 2 -

misleading, as the risks they "warned of" had already materialized, rendering them actionable under well-established Ninth Circuit precedent. The shortcomings in the Company's risk disclosures also provide additional, independent grounds for §11 liability under SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105").

*Third*, Defendants urge the Court to dismiss certain statements as immaterial as a matter of law, but they fail to establish that the challenged statements were so "***obviously unimportant***" that dismissal would be warranted. Nor could they – the challenged statements were undeniably material, as is evident by investors' reactions to the Company's disclosure of decelerations in MAU and revenue amid investors' "expectations of growth."

*Fourth*, the Registration Statement was misleading because it failed to disclose negative trends based on data WEBTOON tracked and reviewed on a daily, weekly, and monthly basis. Defendants' failure to comply with SEC disclosure obligations under SEC Regulation S-K (17 C.F.R. §229.303) ("Item 303") provides an independent basis for sustaining the §11 claim.

*Finally*, contrary to Defendants' arguments, at the motion to dismiss stage, courts are reluctant to resolve questions concerning, *inter alia*: (i) falsity; (ii) materiality; and (iii) what constitutes a "trend" requiring disclosure, because those inquiries are inherently fact-intensive inquiries and are not appropriate for resolution on a Rule 12(b)(6) motion. Defendants' MTD should be denied.

## I.     FACTUAL BACKGROUND

WEBTOON is global storytelling platform that allows creators to tell stories and comics with users around the world. ¶3. Three months into its 2Q 2024, the Company went public. *Id*. In the Registration Statement, Defendants described WEBTOON as a "high-growth startup," which as of the time of the IPO, had "experienced rapid growth in [its] business and revenue" (¶4) and had grown to become a leading web-comic provider in terms of MAU (¶46).

- 3 -

4900-4398-3397.v1

## A.     The Company's User Base

MAU is the backbone by which to gauge WEBTOON's success.  According to the Registration Statement, the Company's "financial performance has been, and will continue to be, significantly determined by our success in retaining, attracting and engaging MAU and converting them into [paying users]." ¶¶6, 53.  The MAU metric is so critically important that WEBTOON tracks and "regularly review[s]" it "to measure our performance, identify trends, formulate financial projections, and make strategic decisions," and to "evaluate growth trends [and] analyze user demand." ¶47. WEBTOON "look[s] at average users on a daily, weekly and monthly basis to understand broader trends in consumption."  ¶¶5, 47, 49.

Given its importance, the Registration Statement showed "Trends in Monthly Active Users," which portrayed the Company's MAU growth as of the time of the IPO as having "demonstrated durable and consistent growth across regions."  ¶57. According to the Registration Statement, WEBTOON's Global MAU had "scaled" and "stabilized to reach approximately 170 million," and WEBTOON had been experiencing a trend of accelerating YoY growth in Global MAU for the four quarters immediately preceding the IPO, achieving 3.7% YoY growth as of 1Q 2024. ¶¶57-58, 86.  The Registration Statement also reported that in Korea, WEBTOON's "largest and most mature market," MAU "display[ed] a generally stable trend with modest fluctuations," while for Rest of World MAU, "[s]tarting from the third quarter of 2023, we observed rebound of our MAU, driven by organic user growth," ending 1Q 2024 with $123.2 million MAU and nearly 4% YoY growth.  ¶¶58-59, 87-88.  The Registration Statement's MAU tables depicted sustained YoY MAU growth leading up to the IPO.  *See*, ¶57; *see also* Declaration of Austin Norris in Support of Defendants' MTD ("Norris Decl."), Ex. 3 at 90.

## B.     Revenue Prospects

The Registration Statement touted the Company's key opportunities for revenue growth, claiming, *inter alia*, that the Company's purported "Growth Strategies,"

- 4 -

4900-4398-3397.v1

included "[a]ccelerat[ing] the growth of our advertising business by enhancing our advertising products and reaching new advertisers," while also boasting WEBTOON's "significant additional market opportunity" in the Company's IP Adaptations business." ¶¶64-65. The Registration Statement also trumpeted that WEBTOON's "total monthly Paid Content ARPPU has increased over time," (¶¶54, 62-63) and that the ARPPU metric had climbed to $11.50 as of 1Q 2024, making that quarter more successful in the key metric than any other quarter in the preceding two years. ¶63. The Registration Statement also showed that WEBTOON had experienced a trend of YoY growth in ARPPU for the five quarters preceding the IPO. *Id.*

### C.     Post-IPO Disclosures

Three days after the IPO, on June 30, 2024, the Company's 2Q 2024 ended. ¶104. On August 8, 2024, WEBTOON released its results for the IPO quarter, revealing flat total revenue growth (0.1%), negative growth in both IP Adaptation (-3.7%) and Advertising revenue (-3.6%), and a 30 cent decline in ARPPU for the quarter, driving the metric to the lowest YoY growth it had seen in five quarters.[3] ¶106. The Company also disclosed substantial declines in Korea MAU (negative 6.6% YoY growth) and Rest of World MAU that drove a multi-million user deterioration in Global MAU and deceleration in growth (-0.8%) for the metric, which was in stark contrast to the accelerating YoY growth the Registration Statement showed for the prior four quarters. ¶¶105, 108. The chart below reveals the Registration Statement's MAU growth trends together with the undisclosed negative trend, which has persisted through the Company's 3Q 2024 (*see*, ¶¶57, 60):[4]

---

[3]     Defendants claim the Complaint "patently mischaracterizes the historical [ARPPU] data in the RS." MTD. at 4 n.3. The chart in the Complaint (¶63) which is pulled directly from the Registration Statement makes that clear. *See* Norris Decl., Ex. 3 at 93. The Company's 2Q 2024 ARPPU of $11.20 represented YoY growth of just 1.8%, which was in fact lower than the preceding five quarters of YoY growth, and reflected ***negative*** 2.8% quarter-over-quarter growth (¶91) which stood in stark contrast to the preceding quarters of growth for the metric.

[4]     In an effort to dispute the Complaint's MAU allegations, Defendants have sought to include their own post-IPO facts in support of the MTD. But that data confirms the

4900-4398-3397.v1



During the Company's earnings call the same day, Defendant David J. Lee announced WEBTOON's disappointing "reported revenue" caused by "significant exposure to weaker foreign currencies, including the Korean won and the Japanese yen," (¶107) and revealed that MAU and ARPPU were negatively impacted by "decreased user engagement" and "softer overall user dynamics" resulting from the delayed pre-IPO launch of the Company's AI-recommendation tool (¶¶89, 108).  On this news, the price of WEBTOON common stock plummeted.  ¶109.

According to analysts, the Company's 2Q results "did not have strong upside" (¶110) and generated "consistent investor concerns" and a "negative shift in sentiment" in the newly-traded "growth" Company as the market "reacted negatively to the weak MAU trend."  ¶¶111-113.  They reported WEBTOON's "Monthly Active Users Missed Expectations in 2Q," and that "WBTN's monthly active users (MAUs) declined both q/q and y/y in 2Q *vs. expectations of growth for both metrics*."  ¶113.

negative growth trend in MAU has been persistent, resulting in ***negative*** 5% YoY in the metric for 3Q 2024.  *See* MTD at 4, Figure 2 (declining from 175.5 million to 166.8 million).

- 6 -

4900-4398-3397.v1

Morgan Stanley noted "the fact that MAUs were the source of the [Company's] weakness raises longer term concerns," and that "[t]he company will now likely face greater scrutiny from investors." ¶114.

Analysts also attributed the stock decline to "weaker than expected 2Q revenue of $321mn (flat YoY), -6% below consensus $341mn." The miss was attributed to "strong US $ against KRW and JPY," and analysts cited "weak revenue growth on FX." ¶110. According to one analyst, "nearly all of our recent investor conversations touched on WBTN's 2Q GAAP revenue of $321mn (6% below our prior estimate and consensus." ¶113.

WEBTOON's stock price has never recovered. By the commencement of this action, WEBTOON stock had traded as low as $11.15 per share, reflecting a nearly $10 decline (47%) per share from the $21 per share IPO price. ¶¶14, 115.

## ARGUMENT

## II.    THE COMPLAINT PLAUSIBLY ALLEGES A §11 CLAIM

### A.    Applicable Legal Standards

The Securities Act "protects investors by ensuring that companies issuing securities . . . make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015).[5] Section 11 "impos[es] a stringent standard of liability on the parties who play a direct role in a registered offering" for their failure to comply "with the disclosure provisions of the [Securities] Act." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

In assessing a Rule 12(b)(6) motion, a court must "accept all factual allegations . . . as true[,]" and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Plaintiff's §11 claim is subject to the "extremely liberal pleading standard" of Rule

---

[5]    Citations are omitted and emphasis added unless otherwise indicated.

- 7 -

8(a).[6] *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *12 (C.D. Cal. July 21, 2005); *see also* Fed. R. Civ. P. 8(a)(2). A complaint should not be dismissed if, when construed in the light most favorable to plaintiff, it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Section 11 liability attaches not only to statements that are affirmatively false, but also to statements that "omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). Even objectively true statements are actionably misleading if they "omit[] material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). A §11 claim is sufficient if it plausibly alleges "'(1) that the registration statement contained an omission or misrepresentation; and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'" *Lilien v. Olaplex Holdings, Inc.*, 2025 WL 444254, at *6 (C.D. Cal. Feb. 7, 2025). Once a material misstatement or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 382.

**B.    The Registration Statement Was Materially Misleading**

"'A statement or omission is misleading . . . if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Id.* (quoting *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011)). "'[A] misrepresentation or omission is material if there is a

---

[6]    Defendants claim the Complaint is subject to the heightened pleading requirements of Rule 9(b) because it "sounds in fraud." MTD at 8. They are wrong. The Complaint does not allege a "unified course of conduct." *Id.*; *see also Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005) ("These [§11] claims are not 'grounded in fraud' because Plaintiffs allege a basis for Section 11 liability other than fraud; *i.e.*, the omission of a material fact from the Registration statement. Notably, plaintiffs do not rely on a unified course of fraudulent conduct . . . ."); *see also Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *4 (N.D. Cal. Sept. 28, 2023).

- 8 -

4900-4398-3397.v1

substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed.'" *Khoja*, 899 F.3d at 1009.

"'[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are ***so obviously unimportant*** to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *In re DDi Corp.*, 2005 WL 3090882, at *11. "'[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'" *Green Dot Corp.*, 2024 WL 1356253, at *4 (C.D. Cal. Mar. 29, 2024). "'Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is "so obvious that reasonable minds could not differ."'" In other words, at the pleading stage, plaintiffs hold "'a relatively minimal burden,'" as they "'need only show a material misstatement or omission to establish a prima facie case.'" *Lilien*, 2025 WL 444254, at *6.[7]

### 1.   Material Misstatements About WEBTOON's User Base

The Registration Statement described that as of the IPO, the Company's critically important MAU key metric had "demonstrated durable and consistent growth across regions," (¶57) described that Global MAU had "stabilized," and that Korea MAU had "displaye[d] a generally stable trend," (¶58) while for Rest of World, the Company "observed rebound of our MAU." ¶58. These statements were presented along with disclosed "Trends in Monthly Active Users," and quantitative user values and trend tables which revealed persistent, YoY growth in Global MAU in the lead up to the IPO. *See* chart, ¶57. Yet at the same time, before the IPO, the

---

[7]   The Complaint satisfies Rule 8 by specifying each statement at issue, describing what is false and/or misleading about them, and concisely discussing why each category is so. ¶¶57-60 (MAU); ¶¶61-66 (revenue); ¶¶67-68 (foreign currency); ¶¶69-75 (risk disclosures). This is not puzzle pleading. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014).

- 9 -

4900-4398-3397.v1

Company had suffered from "softer overall user dynamics," caused by the undisclosed delay in the pre-IPO launch of WEBTOON's AI-powered recommendation tool, lending to a multi-million user deterioration in the critically important MAU metric (¶¶11, 103), which the Company "regularly review[ed]" and tracked on a daily, weekly and monthly basis (¶¶47-48).

The then-existing facts belied the Registration Statement's rosy MAU claims. As courts in the Ninth Circuit have repeatedly held, once defendants "'chose to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016); *Omnicare*, 575 U.S. at 192 ("Congress adopted §11 to ensure that issuers 'tell[] the whole truth' to investors," such that defendants must "desist from misleading investors by saying one thing and holding back another.").

The Complaint's MAU statements are actionable not because ***historical*** MAU information was inaccurate (MTD at 11-22), but because the MAU statements conveyed that WEBTOON's MAU was experiencing ***then-current*** stability, durability, and persistent growth, while failing to disclose context undercutting those disclosures. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1137 (N.D. Cal. 2017). In *Twitter*, the Court considered whether the company's claims that MAU trends "ha[d] already turned around," were actionable where they "convey[ed] a message . . . that MAU was trening [*sic*] positively, and [it was] interpreted by analysts as such." *Id.* Applying *Schueneman*, 840 F.3d at 705-06, the *Twitter* court concluded that MAU statements were misleading in light of the omission of internally-tracked metrics that undercut the public statements concerning MAU. *Twitter*, 282 F. Supp. 3d at 1138 (noting, "in the absence of [the omitted data], investors interpreted Defendants' statements as reassurances that the Company had experienced and would continue to experience positive growth [in MAU]"). The same is true here – the Registration Statement positively portrayed MAU while

- 10 -

4900-4398-3397.v1

omitting information concerning then-existing deceleration in the critical MAU metric (including from "softer overall user dynamics" and decreased "user engagement"), which investors would have deemed important – as was made obvious by investors' reaction to the reported decline of MAU amid "expectations of growth" in the key metric.  ¶¶108, 113.  Put simply, the omitted information would have meaningfully contextualized the Registration Statement's claims concerning MAU.

Defendants also claim they had no affirmative obligation to disclose intra-quarter MAU based on the incredulous assertion that "Defendants could not have known the MAU Q2 2024 results until Q2 2024 had ended" and that the "data . . . did not yet exist."  MTD at 12-15.  Defendants admitted that MAU was negatively impacted by the failed launch of an AI-recommendation tool at the beginning of 2Q 2024, which started three months prior to the IPO.  ¶¶89, 10.  Defendants' argument also directly ignores the Registration Statement's claim that the Company regularly "track[s] and review[s]" MAU (¶47) and the Company's own admission that it "look[s] at average users on a daily, weekly and monthly basis to understand broader trends in consumption."  ¶49.

Moreover, as the Ninth Circuit has made clear, "[w]e have never held – nor even hinted – that . . . intra-quarter data cannot, as a matter of law, be material."  *U.S. v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998).  Even the case upon which Defendants rely, *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 615, 620 (9th Cir. 2022), clearly confirms that "[a] company ***must*** disclose a negative internal development . . . if its omission would make other statements materially misleading."  *Id.* at 620 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)).  Thus even assuming a company "'has no general obligation to disclose the results of a quarter in progress,'" (MTD at 13), the familiar standard remains – once Defendants "'chose to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information."  *Schueneman*, 840 F.3d at 706.

- 11 -

4900-4398-3397.v1

Defendants rely heavily on *Golubowski v. Robinhood Mkts., Inc.*, 2024 WL 269507 (N.D. Cal. Jan. 24, 2024). There, the court dismissed plaintiff's claims, holding that the company's declining metrics were not "so extraordinary" and not "sufficiently extreme" so as to warrant intra-period disclosure, reasoning that the decline in the company's metrics was simply a "correction" to a previous "spike" and not a business downtown. *Id*. at *8-*9. The Ninth Circuit has not adopted the "extreme" departure standard Defendants urge this Court to apply and the question of whether that standard applies in the securities context is on appeal in the Ninth Circuit following the dismissal in *Robinhood*. *See generally Sodha v. Golubowski*, No. 24-1036 (9th Cir. 2024).

Other circuits have expressly declined to adopt the "extreme departure" standard in light of the long-standing test for gauging the materiality of an omission in securities cases. *See, e.g.*, *Stadnick v. Vivent Solar, Inc.*, 861 F.3d 31, 37 (2nd Cir. 2017) (declining to adopt the "extreme departure" standard and re-affirming use of "the traditional materiality test long employed by courts, including the Supreme Court, in the omission context: 'whether there is 'a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'") (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 399 (1976)). And as the *Robinhood* court itself acknowledged, a decline in key metrics coupled with "the presence of a simultaneous revenue drop could require [intra-quarter] disclosure." 2024 WL 269507, at *8. That is precisely what is alleged here. *See, e.g.*, ¶66 (the Company "was suffering a decline in user base (MAU) as of the time of the IPO, which negatively impacted the Company's ability to generate revenue").[8] Still,

---

[8] Defendants also rely on *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *10 (N.D. Cal. Mar. 10, 2023). MTD at 15. But there, after plaintiff amended its complaint to allege that MAU growth declined YoY (like here), the court upheld allegations that MAU risk disclosures were misleading by omission because the risk of declining MAU had already come to fruition as of the time of the IPO. *See Hoang v. ContextLogic, Inc.*, 2023 WL 8879263, at *11, *15 (N.D. Cal. Dec. 22, 2023).

- 12 -

4900-4398-3397.v1

"'intra-quarter updates may [also] be required[] if intervening events trigger a duty to disclose,'" including under SEC regulations. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013). As discussed below, Defendants did have a duty to disclose under Item 303. *See, infra*, §II.D.1.

### 2. Material Misstatements About WEBTOON's Revenue

The Registration Statement's assurances that WEBTOON had strategies for continued revenue growth contributed to investors' perceived value of WEBTOON's stock. ¶45. Defendants had an affirmative duty to speak with sufficient completeness so as to not mislead investors as to the Company's revenue prospects; they were not free to omit that the "high-growth startup," which as of the IPO had "experienced rapid growth in [its] business and revenue" (¶4), was then: (i) suffering a decline in user base (MAU), which negatively impacted the Company's ability to generate revenue; (ii) facing challenges caused by depreciation in the strength of foreign currency, contributing to the significant deceleration in the Company's revenue growth throughout the first half of 2024; and (iii) experiencing deceleration in Advertising and IP Adaptations revenue streams as of the time of the IPO. ¶66. Failure to provide that context rendered the Registration Statement misleading. *Twitter*, 282 F. Supp. 3d at 1136; *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1018 (N.D. Cal. 2020) (upholding statements "touting the sustainability of [the company's] reported revenue growth" as actionable because "[d]efendants failed to disclose the material facts undermining those [revenue] projections"). Defendants make no arguments to the contrary, and solely urge dismissal because "commentary about accurate historical data is not actionable under the securities laws." MTD at 16.

The Registration Statement also assured investors that revenue had not been impacted by the Company's global operations, claiming that "the impact of foreign currency exchange rates has not been material to our historical operating results."

- 13 -

4900-4398-3397.v1

¶67.[9] That assertion was materially misleading because it omitted that at the time of the IPO, the Company was currently exposed to "significant exposure to weaker foreign currencies" throughout 2Q 2024. ¶68. The Registration Statement thus affirmatively created the impression that foreign currency was not, as of the time of the IPO, having a material impact on the Company's operations. The materiality of the omission is plainly evident as the impact of foreign currency on WEBTOON's reported revenue was a primary point of investor "pushback/concern" and drove "nearly all of [the] recent investor conversations" after the Company reported its 2Q 2024 revenue results. ¶¶112-113.

### 3. The Risk Disclosures Are Also Misleading

The Ninth Circuit has repeatedly held that "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008)); *see also In re Facebook, Inc. Sec. Litig.*, 2023 WL 8365362, at *9 (9th Cir. Dec. 4, 2023); *Lilien*, 2025 WL 444254, at *7-*10 (analyzing *Alphabet* and *Facebook* in the context of a §11 claim). Defendants do not cite these cases. MTD at 19-20. The Complaint presents the same situation: Defendants presented the risk of declining users and foreign exchange fluctuations as purely hypothetical. ¶¶69-75.

Defendants claim "WEBTOON disclosed the[] materialized risks" of losing customers. MTD at 19. Not so. First, the risk disclosure offered by Defendants in support of that claim, that "'[w]e have experienced, and expect to continue to experience, fluctuations and declines in the size of our user base'") is incomplete. *Id*.

---

[9] The Company's 2Q 2024 Form 10-Q filed with the SEC removed reference to that claim in the "Foreign Currency Exchange Risk" disclosure. *Compare*, ¶67 (Norris Decl., Ex. 3 at 118) *with* Norris Decl., Ex. 4 at 35). Defendants have asked the Court to incorporate by reference these SEC filings.

The next sentence in the Registration Statement states "[a]ny *future* declines in the size of our user base *may* adversely impact our financial performance." *See, e.g.*, ¶71. Second, inaccurately describing as "potential" certain risks that "may" have adverse impacts is not the same as fully disclosing that actual events, trends, and uncertainties had already manifested. *Lilien*, 2025 WL 444254, at *9; *see also In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL 714171, at *8 (C.D. Cal. Mar. 3, 2025) (upholding §11 claim where registration statement "omitted key risk factors by failing to disclose the true condition" of the issuer's operations); *Hoang*, 2023 WL 8879263, at *14 (finding MAU risk disclosures actionable where plaintiffs alleged intra-quarter declining MAUs and that "employees regularly monitored MAUs and . . . were aware of the . . . MAU data" that contradicted the risk disclosures). The Registration Statement's MAU risk disclosures hedging against future potential decline did not, as Defendants claim, "disclose[] the[] materialized risk" (MTD at 19), that had already occurred – that as of the IPO, the Company had *already experienced* declines in the size of its MAU, driven in part by the delayed pre-IPO launch of the Company's AI-recommendation tool, which caused the Company to suffer "softer overall user dynamics" and decreased "user engagement." ¶¶103, 108.

The Complaint also alleges the Registration Statement's risk disclosure that the Company's results of operations "could be" adversely affected by currency exchange rates was materially misleading because it omitted that, as of the time of the IPO, foreign currencies were having an impact on the Company's then-existing 2Q 2024 operations. ¶¶73-75, 95-97. Defendants claim that because currency exchange rates are public information, investors should have known of the depreciating values. MTD at 20. This is "functionally a truth-on-the-market affirmative defense that is 'inappropriate' for resolution at the pleading stage." *Lilien*, 2025 WL 444254, at *10.

In any event, exchange rates are just one piece of the equation. Defendants' argument ignores that while WEBTOON reported its results in U.S. Dollar, "the Company did not provide investors with results of the Company's operations in

- 15 -

4900-4398-3397.v1

Korean Won nor Japanese Yen." ¶55. Without that information, it would be impossible to ascertain what currency fluctuations meant for the Company's global operations, even with the benefit of having real-time currency exchange rates. *See, e.g.*, *Lilien*, 2025 WL 444254, at *10 ("Establishing this defense requires proving that 'the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the [statement at issue].'"). While investors may have been able to convert the Company's reported results to a foreign currency as of a point in time – *i.e.*, as of March 31, 2024, the Company's reported quarter just prior to the IPO – they lacked the insight needed to meaningfully understand intra-quarter fluctuations because information concerning the Company's pre-IPO operations was uniquely held by Defendants and not available to investors. ¶12; *see also Omnicare*, 575 U.S. at 192 n.11 ("an issuer has special knowledge of its business . . . not available to an ordinary investor").

Defendants likewise claim that post-IPO exchange fluctuations somehow render the 2Q 2024's currency fluctuations not so "extraordinary" as to warrant disclosure. MTD at 20. But the standard is whether the Registration Statement contained a material omission as of the time it became effective, not in the context of later developments. 15 U.S.C. §77k(a) ("In case any part of the registration statement, ***when such part became effective*** . . . omitted to state a material fact . . . necessary to make the statements therein not misleading . . . ."). The market reacted to the Company's August 8, 2024 disclosures regarding "significant exposure to weaker foreign currencies" and deterioration in MAU (¶¶107, 110) and Defendants have failed to show that the Company's risk warnings were clear enough that ""reasonable minds" could not disagree that the challenged statements were not misleading.'" *Twitter*, 282 F. Supp. 3d at 1133. The Complaint plausibly alleges that the Registration Statement's warnings of risks that "could" or "may" occur were

- 16 -

4900-4398-3397.v1

misleading at the time the Registration Statement became effective. *Lilien*, 2025 WL 444254, at \*7-\*10.

Defendants' argument concerning the Company's risk disclosure that "'business is affected by seasonal demands, and our quarterly operations results fluctuate as a result,'" is taken out of context.  MTD at 19.  That disclosure alerted investors to changing "seasonal demands," because according to the Registration Statement, the Company traditionally generated more user monetization (Paid Content revenue) in 3Q and typically generated more Advertising revenue in its 4Q. *See* Norris Decl., Ex. 3 at 47.  That seasonality is irrelevant to the facts currently existing in the Company's 2Q 2024.  Defendants' argument also ignores that the Company admitted the declines in key metrics had ***nothing to do with seasonality*** – and instead attributed the decline in MAU and ARPPU to the delayed pre-IPO launch of the Company's AI-recommendation tool (¶¶89, 108), and attributed the disappointing 2Q 2024 reported revenue to "significant exposure to weaker foreign currencies."  ¶107.

Other risk disclosures challenged by Defendants are wholly irrelevant and provide no more than a distraction for the Court and should be disregarded – the Complaint makes no reference, for example, to the misleading nature of any statements concerning "net losses," "net income," nor "expenses," and those statements have no bearing on the alleged falsity of statements concerning MAU or revenue.  MTD at 7, 19.

### C. Defendants' Other Materiality Arguments Are Unavailing

#### 1. The Misstatements Are Not Inactionable Puffery

Defendants claim their MAU statements that included descriptors like "stable," "durable," "consistent," or "significant" are inactionable puffery.  MTD at 10. Dismissal on puffery grounds is warranted "only if . . . the statement is so ***obviously unimportant*** to a reasonable investor that reasonable minds could not differ on . . . their unimportance." *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022).  This Court just recently upheld similar user base statements over

- 17 -

4900-4398-3397.v1

defendants' puffery challenges. *See Local 272 Labor-Mgmt Pens. Fund v. The Walt Disney Co.*, 2:23-CV-03661, ECF 86 at 108, 109, 111, 2025 WL 569230 (C.D. Cal. Feb. 19, 2025) (Marshall, J.) (upholding allegations that Disney "saw ***strong*** additions to our subscriber base," that "subscriber growth was also ***solid***" and that Disney had "***significant*** subscriber growth," dismissing feel-good monikers that defendants were "pleased," "bullish," "enthusiastic," and "extremely happy"); *see also Twitter*, 282 F. Supp. 3d at 1141 (upholding claim that company's MAU ratio was "similar").

In the Ninth Circuit, "puffery" statements are actionable if they "'affirmatively create[] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Statements that the Company's MAU "***have demonstrated*** durable and consistent growth," "***[is] displaying*** a generally stable trend" and "***observed*** rebound" (MTD at 10; ¶¶57-59, 87) very clearly go beyond mere optimism by "provid[ing] a concrete description of the past and present state" of WEBTOON's MAU. *Quality Sys.*, 865 F.3d at 1144. In *Quality Sys*, the Ninth Circuit held that assurances the company's sales pipeline "was unchanged, or even growing, compared to previous quarters" were not puffery. *Id.* The Ninth Circuit reasoned that "even general statements of optimism, when taken in context," are actionable if they omit material, adverse facts about "specific aspects of a company's operation." *Id.* at 1143. Thus, statements concerning the company's pipeline, which, like here, defendants allegedly "kept continuous track [of], in real time," were actionable. *Id*. at 1136. The same can be said of WEBTOON's Registration Statement, which provided assurances about the past and present state of WEBTOON's critically important "key metric," which was not only crucial to the Company's success and growth (¶¶5-6, 53), but was tracked and reviewed on a "daily, weekly, and monthly" basis (¶5). The Registration Statement's optimistic MAU statements that "'contravened the unflattering facts in [WEBTOON's] possession'" are not puffery. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023).

- 18 -

The challenged MAU statements were also made in conjunction with, and tethered to, quantitatively verifiable metrics concerning the present state of the Company's operations – *i.e.*, that Global MAU had "demonstrated durable and consistent growth," and had "scaled" and "stabilized to reach approximately 170 million" representing YoY growth of 3.7% (¶¶57-58); that Korea MAU of "27.4 million" "display[ed] a generally stable trend," (*id.*); and that for Rest of World, "[s]tarting from the third quarter of 2023, we observed rebound of our MAU" (¶59) and had "entered a period of stabilization" at 123.2 million users and nearly 4% YoY growth as of the quarter immediately preceding the IPO (¶87).  With this context in mind, it cannot be said that these assurances about specific aspects of WEBTOON's operations were so "'***obviously unimportant*** to a reasonable investor'" that the MAU statements should be dismissed as a matter of law.  *Honest*, 615 F. Supp. 3d at 1154. To the contrary, the materiality of the Company's MAU statements is evident by the market's reaction to the weak MAU trend.  ¶110.

Defendants also seek dismissal of certain revenue statements as puffery.  MTD at 15.[10]  Those statements created the impression that as of the IPO, the Company's Advertising revenue growth was "accelerating" (¶64), and that IP Adaptation revenue was "strengthening" (¶65) – not that the Company was actually experiencing deceleration in revenue in those streams caused by decreased users and foreign currency fluctuations that negatively impacted the stability of and growth in the Company's reported revenue. ¶66; *see also Rodriquez v. Gigamon Inc.*, 325 F. Supp.

---

[10]  Defendants also claim certain revenue statements are mere opinion.  MTD at 16-17.  Like puffery, "whether an omission makes an expression of opinion misleading always depends on context."  *Omnicare*, 575 U.S. at 190.  Statements of opinion are actionable where they "[do] not 'fairly align[] with the information in [a company's] possession at the time."  *Id.* at 189. The Complaint has plausibly alleged that when the Registration Statement touted the Company's revenue prospects, foreign currency fluctuations and decreased user dynamics were already negatively impacting the Company's revenue.  ¶¶89, 108.  Those "real facts" were not provided to investors. *Omnicare*, 575 U.S. at 176 ("if the real facts are otherwise, but not provided, the opinion statement will mislead by omission").

- 19 -

4900-4398-3397.v1

3d 1041, 1054 (N.D. Cal. 2018) (upholding statement that defendants were "'accelerating top-line revenue growth'"). It cannot be said that the revenue statements were so "***obviously unimportant***" that they must be dismissed as a matter of law. *Honest*, 615 F. Supp. 3d at 1154; *see also cf. Smith*, 155 F.3d at 1065 (noting in the context of forward-looking statements, "[n]or can there be any doubt that the forecast of earnings was a 'material' fact . . . generally earnings projections of a company constitute a prime factor in estimating the worth of its stock, especially when made close to the end of the fiscal [period]").[11]

## 2. The Bespeaks Caution Doctrine Does Not Apply

Defendants claim a fragment of one MAU statement and a handful of revenue-related statements are forward-looking and thus entitled to dismissal as a matter of law. MTD at 12, 17-18.[12] They are wrong. The bespeaks caution doctrine considers whether "'forward-looking representations contained enough cautionary language or risk of disclosure to protect the defendant against' Section 11 claims." *Honest*, 615 F. Supp. 3d at 1155. Application of the doctrine "at the pleadings stage requires a 'stringent showing' that 'the language bespeaking caution . . . relate[s] directly to that

---

[11] The growth cases cited by Defendants are inapposite. MTD at 15. For example, in *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022), the Ninth Circuit deemed statements describing the company's "'tremendous growth'" nonactionable puffery because, unlike here, the company's performance was in fact "still growing." *Id*. at 1099 ("these feel-good descriptions . . . did not 'affirmatively create[] and impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'"). In *In re On24, Inc. Sec. Litig.*, 2023 WL 7449838, at *11 (C.D. Cal. July 7, 2023), the court dismissed statements as immaterial because plaintiff failed to show the statements "'affirmatively create a positive impression of an area [the company] knows to be doing poorly.'" Plaintiff here makes that showing.

[12] Defendants assert that the statement, "[t]his sets the stage for significant opportunities to drive user growth," is protected by the bespeaks caution doctrine. The complete statement alleged in the Complaint is that "[s]tarting from the third quarter of 2023, we observed rebound of our MAU, driven by organic user growth and a clear focus on prioritizing our core markets. . . . This sets the stage for significant opportunities to drive user growth." ¶59. That statement is at the very least a mixed forward-looking and non-forward looking statement because it concerned then-existing or historical facts, *i.e.*, that Rest of World MAU ***had*** "***observed*** rebound." *Id.*

- 20 -

to which plaintiffs claim to have been misled.'" *Id.*  The doctrine does not extend to failure to disclose past or then-existing material events. *Id*.

Defendants fail to identify the specific risk disclosures that would insulate them from liability, instead referring the Court to the Registration Statement's 47 pages of generic risk disclosures.  MTD at 12, 17.  Defendants' conclusory claims that the challenged risk statements, which are directly at issue in this case (*see* §II.B.3.), sufficiently insulated forward-looking statements together with their failure to identify specific risk warnings that insulate them does not meet the "stringent showing." *Honest*, 615 F. Supp. 3d at 1155.

### D.    Items 303 and 105 Provide Independent Bases for Liability

"[I]n addition to proscribing lies and half-truths, [§11] also creates liability for failure to speak on a subject at all."  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).   In the Ninth Circuit, "[a]llegations sufficient to state a claim under Items 105 and 303 are also sufficient to state a claim under Section 11 and 12(a)(2) of the [Securities] Act."  *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *15-*16 (C.D. Cal. July 3, 2023) (citing *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1296-97 (9th Cir. 1998)); *Freshworks*, 2023 WL 6390622, at *7.  These provisions are designed to give investors a clearer picture of a company's financial health, operations, risk, and any significant trends or uncertainties that could impact the company's future performance.

### 1.    Violation of Item 303 Creates §11 Liability

Item 303 imposes an independent and affirmative duty to disclose "any known trends or uncertainties that have had or that [the registrant reasonably expects will] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(2)(ii).  The issue of "[w]hether the [known trend or uncertainty] was in fact at the time of the IPO ***reasonably likely*** to materially affect [the registrant's] financial condition, and whether [the registrant] had ***present knowledge*** of those facts, can only be determined with a complete factual

- 21 -

record" and therefore is "more ripe for adjudication at the summary judgment stage." *Lilien* 2025 WL 444254, at \*17 (emphasis in original).

Though Defendants urge the Court to adopt a bright-line rule (MTD at 21-22), "'[t]he case law is far from settled regarding the length of time necessary to constitute a 'trend' for the purpose of Item 303'" and what constitutes "a trend [under Item 303] may be a 'factual inquiry' that is resolved at a later stage of the case." *Freshworks*, 2023 WL 6390622, at \*7.   Still, as the Ninth Circuit has acknowledged, "[a] slowdown after a period of growth might be a trend." *Steckman*, 143 F.3d at 1297.  In *Steckman*, the company's IPO was three weeks before the end of 4Q.  *Id*. at 1294. Fourth quarter results were released six weeks later, revealing a "slowdown" between 3Q and 4Q.  *Id*. at 1295, 1297.  The Ninth Circuit found the intra-quarter slowdown constituted a "known trend" under Item 303.[13]  *Id*. at 1297; *see also Freshworks*, 2023 WL 6390622, at \*7 (upholding Item 303 claim based on "one quarter of financial deceleration").  The same is true here.

The Complaint plausibly demonstrates adverse trends and uncertainties that Defendants omitted from their offering materials regarding key financial metrics and the impact of foreign currency fluctuations on Defendants' revenue, which were required to be disclosed under Item 303.  *See* ¶¶85-89 (MAU); ¶¶90-92, 99-100 (revenue); ¶¶93-98 (foreign currency).   By WEBTOON's own admission the deterioration in MAU began in early 2Q 2024, *i.e.*, up to three months before the IPO. ¶¶89, 108; *see also* Norris Decl., Ex. 6 at 6 ("Originally slated to launch at the beginning of 2Q, the delay in the launch of the recommendation model resulted in softer overall user dynamics in the quarter as [Korea] MAU of 23.2 million decreased by 6.6%.").  Similarly, the Complaint reveals a trend in the depreciation of foreign currency fluctuations persisting at least through the first half (*i.e.*, 6 months) of 2024.

---

[13]  The issue in *Steckman* that obviated the need for disclosure was that the "known trend" was not reasonably likely to have a material impact.  *Id*. at 1297-98.

- 22 -

¶¶93-97. These metrics did not change overnight, nor do they constitute at best "short-term fluctuations" as Defendants claim.[14]

Defendants impermissibly ask the Court to go beyond the Complaint's four corners, urging that events that post-dated the Complaint (*i.e.*, that foreign currency fluctuations improved and that MAU and revenue increased in 3Q 2024) somehow undermine the trend analysis. MTD at 22-23. But "disclosures under Item 303 ***were required to be accurate and complete as of the time Registration Statement became effective***. Defendants' duty under Item 303 was triggered before the Registration Statement became effective." *Facebook*, 986 F. Supp. 2d at 513 ("That Facebook identified the trend intra-quarter [and 10 days before the IPO] is of no issue; under Item 303, Defendants were required to disclose the issues even though it arose intra-quarter."); *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1065-67 (M.D. Tenn. 2022) (allegations of "downward trend[s]" in quarter in which IPO occurred were sufficient to plead a material omission under Item 303). In any event, as described above, the downward trend in MAU growth persisted at least through 3Q 2024. *See*, *supra* §I.C (chart of Global MAU – Undisclosed Negative YoY Growth Trend).

The Complaint also plausibly alleges these adverse trends were reasonably likely to have a material adverse impact on WEBTOON's operations given the critical import of the MAU and ARPPU metrics, and impact global operations had on the Company. *See* ¶¶6-7, 107. Remarkably, Defendants claim they did not have knowledge of the adverse trends. MTD at 23. That claim is not only wholly

---

[14] Defendants again rely on *Robinhood*, 2024 WL 269507, at*7. MTD at 22. But there, the court determined the decline constituted "what appears to be a correction" to an "unprecedented spike" in the relevant metric prior to the IPO, and "not a downturn in the business," and thus did not constitute a trend. *Robinhood*, 2024 WL 269507, at*9. The court accordingly distinguished the situation from *Franchi*, 2022 WL 4594575, at *10, noting where, like here, "the sudden downward trend in three financial metrics in the quarter" could constitute a trend. *Id*. at *13. *Robinhood*, 2024 WL 269507, at *13.

- 23 -

4900-4398-3397.v1

implausible, but it also directly contradicts the Registration Statement's assertions that WEBTOON "*track[s] and review[s]* [MAU and ARPPU] to measure our performance, *identify trends*, formulate financial projections, and make strategic decisions," to "*evaluate growth trends [and] analyze user demand*," (*id.*) and that WEBTOON "*regularly review[s]*" MAU and ARPPU. ¶47. WEBTOON admitted it "look[s] at average users on a daily, weekly and monthly basis." ¶49. The Complaint plausibly alleges defendants' awareness of the existence of undisclosed adverse trends or uncertainties that existed as of the IPO that were reasonably likely to have a material impact on WEBTOON's operations. *Lilien*, 2025 WL 444254, at *17-*18; *Freshworks*, 2023 WL 6390622, at *8. This creates §11 liability.

### 2.      Violation of Item 105 Creates §11 Liability

Item 105 provides a separate basis for §11 liability, when the offering materials fail to provide "a discussion of the [most significant] factors that make . . . [the] offering speculative or risky." 17 C.F.R. §229.105(a). "'[C]ourts have held that a company's risk disclosures are misleading in violation of Item 105 where [like here] the "risk factors" reported in the Registration [statement] had already materialized by the time of its IPO.'" *Lilien*, 2025 WL 444254, at *17 (collecting cases). As described above, the Company's risk disclosures were themselves materially inadequate because they warned of risks that had already materialized. Defendants' violation of Item 105 provides an independent basis for the §11 claim.

### III.   THE COMPLAINT ALLEGES A VIOLATION OF §15

Under §15, an issuer's "control[] persons" are liable for a primary violation of §11. 15 U.S.C. §77o. "Plaintiff has adequately alleged that the Individual Defendants were control persons within the meaning of Section 15 by alleging that the Individual Defendants signed the [Registration Statement]." *Lilien*, 2025 WL 444254, at *19; *see also*, ¶¶21-27. Because the Complaint adequately alleges primary violations of the §11, the §15 claims against the Individual Defendants must also be sustained.

- 24 -

4900-4398-3397.v1

## IV.  CONCLUSION

The MTD should be denied.  Should the Court grant the MTD, in whole or in part, Plaintiff requests leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003).

DATED:  March 11. 2025

Respectfully submitted.

s/ Ashley M. Kelly
ASHLEY M. KELLY

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT R. HENSSLER JR.
ASHLEY M. KELLY
RACHEL C. BRABY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bhenssler@rgrdlaw.com
ashleyk@rgrdlaw.com
rbraby@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 25 -

4900-4398-3397.v1